## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JASON ERIC GRIMES | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-12-1603 |
| | : | |
| | : | |
| WAYNE A. WEBB | : | |
| | : | |

### MEMORANDUM

Jason Eric Grimes, through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a sentence imposed on April 20, 2006, in the Circuit Court for Kent County, Maryland.[1]  Respondent has answered the merits of the petition, and Grimes has replied.  The parties have filed additional briefing in response to a court order concerning the appropriate standard of review as raised in Grimes's reply.  After reviewing these materials, the court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; 28 U.S.C. § 2254(e)(2).  For the reasons that follow, the petition will be denied and a certificate of appealability will not issue.

### BACKGROUND

On February 7 and 8, 2006, Grimes was tried in the Circuit Court for Kent County before Judge Raymond Beck, Sr. on charges of attempted kidnapping, second-degree assault, false imprisonment, and reckless endangerment.  (ECF No. 3-1 at 10.)  The relevant facts developed at Grimes's trial were summarized as follows by the Court of Special Appeals of Maryland:

> The events at issue occurred on August 27, 2005, when Lynn Hilfiker was assaulted while walking her dog.

---

[1]      Grimes does not challenge his underlying conviction in this proceeding.

Thomas Buckley and Joe Weber, two of appellant's friends, testified for the State. Buckley, Weber, and appellant met each other in the summer of 2005, when the three were patients at the Whitsitt Center, a residential treatment center for drug and alcohol addiction.   A few weeks before the events at issue, appellant was released from the Whitsitt Center and moved into a spare room in Buckley's home.

Buckley testified that on the afternoon of Friday, August 26, 2005, appellant drove him to the Kent County Detention Center, using Buckley's green Subaru station wagon.   Buckley was required to spend the weekend at the detention center as the result of a conviction for driving while intoxicated.   According to Buckley, appellant had the use of Buckley's Subaru for the weekend, with the understanding that appellant would pick Buckley up from the detention center on Sunday.

Weber testified that later that evening, appellant drove to Weber's apartment, where appellant and Weber began to smoke crack cocaine.   Eventually, the pair relocated to Buckley's house and were joined by three other individuals.   Over the course of the evening and into the early morning hours of August 27, 2005, the group consumed several hundred dollars' worth of crack cocaine.   Appellant and one of the other members of the group also consumed two fifths of vodka.   At 4:30 a.m. on Saturday morning, appellant drove Weber and one of the other guests back to Weber's apartment, using Buckley's Subaru, and then returned to Buckley's house.

At around 8:30 a.m. on Saturday, August 27, 2005, Ms. Hilfiker left her residence on Skinner's Neck Road in Rock Hall to walk her dog.   She planned to walk to a landing at the end of the road.   In the course of her walk, Hilfiker observed a man drive by several times in a green Subaru; he went to the end of the landing, turned around, and came back. She recalled:  "My reaction was to myself, the poor guy is lost."   Nevertheless, Hilfiker decided not to walk "to the end of the landing," explaining: "I simply, he was someone I didn't recognize, and I didn't want to take that chance.  But, I was not, at that point, unduly worried."   Over defense objection, Hilfiker identified appellant as the driver of the Subaru.

After appellant's third or fourth trip past Hilfiker, he stopped his car when he reached Hilfiker. Hilfiker provided the following account:

> [PROSECUTOR]: What happened when the car stopped?
>
> [HILFIKER]:  He got out of the car and asked me for directions to Chestertown.

* * *

[PROSECUTOR]: And do you remember if he walked over close to you? Can you give us some details?

[HILFIKER]: He attempted to walk toward me and I was walking away from him as he was talking to me.  The dog was trying to, the dog was pulling toward him and barking so, and he was continuing closer to the dog.

\* \* \*

[PROSECUTOR]: Did he act in any way aggressive at that time?

[HILFIKER]: I thought that getting out of his car was aggressive. . . .  I felt there was no need for him to get out of his car and I was alarmed. . . .  [H]e simply asked me if I could tell him how to get to Chestertown which I thought was very strange.

[PROSECUTOR]: And did you respond to that question?

[HILFIKER]: I, as I was walking away, I was just pointing in the direction that he should go and told him to make the first left and then go straight.  I just wanted, I didn't give him directions to Chestertown.  I just wanted to get him away from me. . . .  He drove off . . . and I started to run for home with the dog.  I was jogging home.

[PROSECUTOR]: Why did you change from a walk to a run at that time?

[HILFIKER]: Because my daughter was home alone and I wanted to get home.  I thought, I felt certain that he would come back and I didn't want him to see where I lived, and I wanted to get home before he came back.

Appellant drove away, but returned minutes later. Hilfiker had just reached her house when appellant drove past her, heading south.  He quickly turned, pulled alongside Hilfiker, stopped the car, and immediately got out of the vehicle, leaving the engine running.  According to Hilfiker, "[t]he first thing out of his mouth was, 'About those directions to Chestertown—', and he said it as though it was a joke."  She recalled: "I'm not sure how he got in front of me, but he was in front of me lunging at me, and he grabbed me by the chest and proceeded to try to pull me around from my side of the house, around the  back of the car to the other side of the car."  The following transpired:

[PROSECUTOR]: What did he do when he grabbed your body as far as the shoulders?

[HILFIKER]: I planted my feet to the ground as though I was trying to be a dead weight and simply not, simply not move from that location.  And, and he began to kick my legs and try to push them out from under me.

3

[PROSECUTOR]: Okay.  Did he say anything to you?

[HILFIKER]: Yes.  He said I was going to get in the car.

[PROSECUTOR]: Did he say anything else to you?

[HILFIKER]: As I struggled, he said, "Yes, it's going to get worse."  I started to scream. . . .  [H]e loosened one arm and told me he was going to have to punch my face in so that I could not scream.

[PROSECUTOR]: Did he follow up with that?

[HILFIKER]: Yes.  He attempted to follow up with that. He was punching at my head and my face and my arm was loosened like this, blocking his punches.

[PROSECUTOR]: Now, were you moved from where you started, where the attack started to any other distance with respect to his green car?

[HILFIKER]: Yes, I was eventually moved from the driver's side of the car around the back of the car to the passenger side of the car but still located more toward the back.

[PROSECUTOR]: Do you remember the position of either or both of the doors of the green station wagon?

[HILFIKER]: A door was open on the passenger side.

[PROSECUTOR]: How close or far away did he get you to that passenger door?

[HILFIKER]: I don't know.  I'm guessing it was that we were maybe four feet from the door.

Mary Ann Bottomley, Hilfiker's neighbor, came out of her house when she heard Hilfiker's scream.  Bottomley testified:

I opened the door and I, I seen a man had his arms around Lynn and she was . . . trying to brace herself like bending down trying to resist him as he hit her. And he was just trying to push her and pull her towards the car.  And . . . she was just trying to brace herself like to stop him from pushing her in that direction. . . .

According to Bottomley, she came down from her porch, yelling at appellant, "What the hell are you doing?  What are you doing?  Who the hell are you?"  As

4

Bottomley approached, appellant disengaged from Hilfiker, ran around the passenger side of the vehicle, got in on the driver's side, and drove off. As appellant drove away, Bottomley noted the Subaru's license plate number and called 911.

The police traced the license plate to Buckley, and found the Subaru parked in Buckley's driveway. They obtained Buckley's permission to search the house and vehicle. In the Subaru, the police found a length of rope. In the house, they found "legal papers" bearing Grimes's name. The police located appellant at Weber's apartment, where he was arrested at around 4:00 p.m. on August 27, 2005.

Appellant's testimony confirmed Weber's account of the gathering at Buckley's house on Friday night and Saturday morning. After appellant dropped Weber and one of the guests off at Weber's apartment at 4:30 a.m. on Saturday, Grimes returned to Buckley's house. The other two guests left Buckley's house around 7:30 a.m. According to appellant, he had been up all night, and left Buckley's house in the green Subaru sometime after 8:00 a.m. on Saturday to go to work at his brother-in-law's construction site. Appellant decided to take a shortcut "that takes you right to . . . the highway," but was unfamiliar with the route and "got lost." Appellant's route took him from the Piney Neck area of Rock Hall, where Buckley resided, to Skinner's Neck, another area of Rock Hall, where he encountered Hilfiker.

Appellant's trial testimony regarding his two encounters with Hilfiker differed from Hilfiker's account. Appellant testified that, in the first encounter, he stopped his car but did not leave the vehicle. He claimed that he asked Hilfiker for directions to leave the Skinner's Neck area, and then drove off. As to the second encounter, appellant claimed that he pulled up alongside Hilfiker, rolled down his window, and said, "about those directions, obviously I got lost again. Can you give me better directions?" In appellant's account, Hilfiker responded, "not in exact words, but she said generally, she told me that the directions that she gave me were very simple and that I shouldn't have no problem finding my way out. And something to the fact [sic] that anybody could find their way out." Hilfiker's response angered Grimes; he got out of the car and said, "'Bitch, who are you talking to?'" Then, he grabbed Hilfiker in a headlock.

Grimes admitted that he threatened to hit Hilfiker, but he denied that he actually did so. He testified that, as Bottomley emerged from her house, "it did register in my mind that what I was doing was wrong, and it kind of made me think like what was I doing. And . . . then I did release her because of what I was doing, I realized I should not have been doing." Appellant maintained that the passenger-side door was never open, and that when he released Hilfiker, they were on the driver's side of the vehicle. He denied ever saying that he was going to put her in the car, or intending to do so. Rather, appellant contended that he "was angry at

the way she treated me. . . .  [M]y reasoning for thinking that way was because of my intoxication and the effects of the drugs.  I was not thinking clearly."

(ECF No. 1-2 at 1-8 (footnotes omitted).)

The jury acquitted Grimes of attempted kidnapping but convicted him of second-degree assault, false imprisonment, and reckless endangerment.  (ECF No. 1-5 at 255.)  After the verdict was read, Judge Beck stated that he would visit the jurors to personally thank them for their service and "see if [they] have any questions [he] can answer."  (*Id.*)  Neither the prosecutor nor defense counsel objected.  (*Id.* at 256-57.)

At Grimes's sentencing on April 20, 2006, the scope of Judge Beck's discussion with the jurors was revealed to the prosecutor and defense counsel during the following discussion:

[Defense Counsel]:  [The Prosecutor] keeps attempting to go back to this attempted kidnapping.  The jury heard this case.  They rendered a verdict.  On page 8 and 9 [of the pre-sentence investigation report], Mrs. Price, in her evaluation of this case, again outlining the facts, indicates that Mr. Grimes attempted to put Ms. Hilfiker in the car.  The jury said no.  She is also recommending –

The Court:  Well, did you speak to any of the jurors?

[Defense Counsel]:  We –

The Court:  After?

[Defense Counsel]:  No.

The Court:  I saw you waiting for jurors.  I don't know if you spoke to any of them or not.

[Defense Counsel]:  We did not.  They were there.  I believe they were still in the court house when we left.

The Court:  Well, it's clear to me – I spoke to the jury at some length – that they reasonably got hung up over the asportation factor.  There was a statement made "'Ten feet is never enough.', 'A hundred miles is over enough.' . . . 'always enough.'", or a hundred yards, whatever it was.  And they . . . they really . . . the . . . the jury did its job.  And . . . and they did not believe that the ab- . . .

asportation, as laymen, was sufficient to justify attempted kidnapping.   That's what they got hung up on.

[Defense Counsel]:   And I think the jury did do their job.   And I would indicate to the Court, I note that, for the record, I believe it has impacted the recommendation in this particular case.

(ECF No. 1-7 at 28-29.)   Just before delivering Grimes's sentence, Judge Beck further stated, "[t]he jury came that close to finding you guilty of attempted kidnapping.   I'll tell you that. They didn't, so it's not before us, but it was close." (*Id.* at 39.)   Judge Beck then sentenced Grimes to ten years' incarceration for second-degree assault[2] and five years' consecutive incarceration, all five years suspended, for false imprisonment.[3]   (*Id.* at 39-41.)

On direct appeal, Grimes asserted, among other things, that Judge Beck abused his discretion and denied Grimes his constitutional rights by sentencing him based on the court's *ex parte* conversations with the jury as to why he was acquitted of attempted kidnapping.   Grimes therefore sought to have his sentence vacated.   In an unreported opinion filed on November 14, 2008, the Court of Special Appeals affirmed Grimes's conviction and sentence, and in so doing indicated that "[b]ecause the Maryland Rules provide adequate grounds for resolution of the issues . . . [it] need not reach [Grimes's] constitutional arguments." (ECF No. 1-2 at 18.)   The court concluded that while "a court may not consider ex parte communications in making a sentencing determination," it is "the improper judicial *use* of information gleaned from [the] *ex parte* communication, not merely the communication itself, that constitutes reversible error." (*Id.* at 24.)   Declining to directly resolve the propriety of the communication, the court found that the trial court did not use it in arriving at its sentencing determination, and that any error would be harmless.   (*Id.* at 25-26.)

---

[2]      Assault in the second degree carries a maximum sentence of ten years' imprisonment or a fine not exceeding $2,500 or both.   Md. Code Ann., Crim. Law §3-203(b).

[3]      No sentence was imposed for reckless endangerment.   (ECF No. 1-7 at 40.)

Grimes filed a petition for a writ of certiorari with the Court of Appeals of Maryland seeking further review.  (ECF No. 3-5.)  The Court of Appeals of Maryland denied Grimes's petition on March 13, 2009, (ECF No. 3-6), and Grimes's judgment of conviction became final for direct appeal purposes on June 11, 2009, "when the period for filing a petition for a writ of certiorari in the United States Supreme Court expired," *Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000).

On June 1, 2010, Grimes filed a petition for post-conviction relief in the Circuit Court for Kent County.  Grimes claimed that his sentence (1) was imposed in violation of his right to be present at all stages of the proceedings under the Sixth and Fourteenth Amendments; (2) was imposed in violation of his due process right to know in advance of the sentencing hearing the information that would be used in sentencing him and to contest the accuracy of that information; and (3) resulted from a violation of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments.  (ECF No. 3-7 at 2-3.)

On October 15, 2010, Kent County Circuit Court Judge Paul Bowman held a hearing on the claims raised in Grimes's post-conviction petition.  Judge Beck testified as a witness.  Judge Bowman denied relief on December 9, 2010, holding that Grimes's first two constitutional arguments had been "finally litigated" on direct appeal such that a state procedural rule, Md. Code Ann., Crim. Proc. § 7-102(b)(2), barred their relitigation, and that Grimes failed to establish ineffective assistance of counsel.  (ECF No. 1-3 at 4-6.)  On January 7, 2011, Grimes filed an application for leave to appeal the ruling, asserting the same claims raised at the circuit court level.  On May 25, 2012, the Court of Special Appeals summarily denied the application.

Meanwhile, Grimes was paroled under the sentence at issue in this case in the summer of 2009, and was placed on probation.  Grimes, who indicates that he has "a serious substance

abuse problem, relapsed and committed three petty theft offenses in June 2010," resulting in two

theft convictions.  (ECF No. 1 at 3.)  As a result of these convictions and another conviction for

malicious destruction of property, Grimes's parole and probation were revoked.  On December 3,

2010, Judge Bowman imposed the suspended, consecutive sentence of five years' imprisonment

for Grimes's conviction for false imprisonment.

Grimes filed a petition for a writ of habeas corpus in this court on May 30, 2012,

challenging his custody and asserting the same claims raised in his state post-conviction petition.

## ANALYSIS

### I.      Threshold Issues

#### A.  Timeliness

Under 28 U.S.C. § 2244(d)(1), "[a] 1-year period of limitation [applies] to an application

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."

Grimes's conviction became final on June 11, 2009.  He filed his state petition for post-

conviction relief on June 1, 2010, suspending the limitations period ten days before it expired.

*See Harris*, 209 F.3d at 327 ("[U]pon conclusion of *direct review* of a judgment of conviction,

the one-year period within which to file a federal habeas petition commences, but the running of

the period is suspended for the period when state post-conviction proceedings are *pending* in any

state court.").  The Court of Special Appeals denied his application for leave to appeal on May

25, 2012, and he filed his petition in this court on May 30, 2012, with five days remaining in the

one-year limitations period.  Accordingly, Grimes's petition is timely.

#### B.  Exhaustion

Before a petitioner may seek habeas relief in federal court, he must have exhausted each

claim presented to the federal court by seeking review of the claim in the highest state court with

jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b)-(c).  "[A] prisoner does not have 'to ask the state for collateral relief, based on the same evidence and issues already decided by direct review.'"  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (citation omitted).  Rather, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Id.* at 845.  Grimes has done so here, and therefore has fully exhausted the claims presented.

## II.     Grimes's Claims

### A.  Standard of Review

Grimes has raised an issue concerning the standard of review the court must apply to his claims.  "The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 131 S. Ct. 770, 783 (2011).  An application for writ of habeas corpus may be granted only "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  "If an application includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  That restriction limits the availability of a habeas corpus remedy to situations where the state adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  The Supreme Court has described these standards as "difficult to meet," *Richter*, 131 S. Ct. at 786, and "highly deferential," *Lindh v. Murphy*, 521

U.S. 320, 334 n.7 (1997), and the "[p]etitioner carries the burden of proof," *Pinholster*, 131 S. Ct. at 1398.

As to § 2254(d)(1), "[i]n this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (citation omitted). "And an 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citation omitted). Indeed, the "state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87. Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if 'reasonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's determination.'" *Id.* (citation and ellipsis omitted).

In addition, under 22 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." This standard is "arguably more deferential" to state courts than the one set out in § 2254(d)(2). *Wood*, 588 U.S. at 301. Though the Supreme Court has expressly declined to "define[ ] the precise relationship between § 2254(d)(2) and § 2254(e)(1)," *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013), the Fourth Circuit has explained that "[b]oth provisions apply independently to all habeas petitions," *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010). Accordingly, where a petitioner's claim was previously

adjudicated on the merits by a state court the petitioner must demonstrate both that a state court's factual finding was incorrect by clear and convincing evidence, *and* that it was objectively unreasonable in light of the record before the court. *Id.* "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).

Grimes argues that the state courts did not adjudicate his constitutional claims on the merits, and therefore § 2254(d)'s deferential review does not apply. To support his argument that this court should instead review his claims de novo, he points to the state appellate court's statement that "[b]ecause the Maryland Rules provide adequate grounds for resolution of the issues," the court "need not reach [Grimes's] constitutional arguments." (ECF No. 1-2 at 18.)

The court will assume without deciding that Grimes's federal claims were not adjudicated on the merits under § 2254(d). Viewing his claims de novo, the court finds that any error was harmless, and that his claims must therefore fail.[4]

---

[4]       The court notes, however, that under *Harrington v. Richter*, 131 S. Ct. 770 (2011), and *Johnson v. Williams*, 133 S. Ct. 1088 (2013), the state appellate court likely did adjudicate Grimes's federal claims on the merits because Maryland law incorporates those claims. In *Richter*, the Supreme Court held that even where a state court decision is a summary order lacking explanation, "[w]hen a federal claim has been presented to [that] state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 131 S. Ct. at 784-85. In *Johnson*, the Court expanded this presumption to situations where a state court addresses some claims but not others. 133 S. Ct. at 1094-96. The Court explained that "it is not the uniform practice of busy state courts to discuss separately every single claim," and outlined "several situations in which state courts frequently take a different course." *Id.* at 1094. These situations include where "a line of state precedent is viewed as fully incorporating a related federal constitutional right," *id.*; (2) where a state court does "not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim," *id.* at 1095; and (3) where "a state court may simply regard a claim as too insubstantial to merit discussion," *id.*
        Here, the state appellate court focused primarily on Maryland Rule 4-326(d), which concerns a judge's duty to notify the parties of any communication with the jury, and Maryland Rule 16-813, Canon 3(B)(6) of the Maryland Code of Judicial Conduct (now codified, in a slightly modified form, in Maryland Rule 16-813, Code of Judicial Conduct Rule 2.9), which bars a judge from initiating, permitting, or considering ex parte communications or other communications made outside the presence of the parties. The court's statement that it "need not reach [Grimes's] constitutional arguments" makes sense only if the court interpreted the Maryland Rules to incorporate Grimes's arguments under the Fourteenth Amendment. Otherwise, a finding that the sentencing judge's actions did not violate the Maryland Rules would do nothing to eliminate the need to analyze Grimes's Fourteenth Amendment

**B.  Grimes's Due Process Claims**[5]

To surmount the applicable harmless error standard, Grimes must show that the error[6] had a "substantial and injurious effect or influence" on his sentence.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  This court may not grant his petition unless the court has "grave doubt" of the error's harmlessness.  *Bauberger v. Haynes*, 632 F.3d 100, 104 (4th Cir. 2011).[7]

---

claims.  Indeed, a long line of Maryland precedent recognizes that the protections afforded by the Maryland Rules for a defendant's right to be present for every stage of his trial go beyond those of the Fourteenth Amendment.  *See, e.g.*, *Winder v. State,* 765 A.2d 97, 122-23 (Md. 2001) (citing *Williams v. State,* 438 A.2d 1301, 1306 (Md. 1981), for the proposition that "a criminal defendant's right to be present at every stage of his trial is a common law right [and] is to some extent protected by the Fourteenth Amendment to the United States Constitution").  Further the Court of Appeals of Maryland has specifically recognized that Maryland Rule 4-326(d) "codifies" the right of a criminal defendant to be present at every stage of his trial protected by the Fourteenth Amendment, common law, and Article 5 of the Maryland Declaration of Rights.  *State v. Harris*, 53 A.3d 1171, 1179 (Md. 2012).

The appellate court's reliance on *Smith v. State*, 498 A.2d 284 (Md. Ct. Spec. App. 1985), further supports the conclusion that the court viewed its discussion of the Maryland Rules as incorporating Grimes's federal claims. *Smith* blended a discussion of due process with several of the Maryland Rules, essentially treating the two areas of law as interchangeable.  *Id.* at 288-89.  The court ultimately focused on "what the judge [did] as a result of" an improper communication, i.e., the "effect of the communication," *id.* at 288, and held that the judge's actions constituted a "denial of due process," *id.* at 289.  The appellate court in Grimes's case cited *Smith* for the proposition that "it is the improper judicial *use* of information gleaned from *ex parte* communication, not merely the communication itself, that constitutes reversible error."  (ECF No. 1-2 at 24.)  Focusing its inquiry on what the sentencing judge did as a result of his communication with the jury, the court held that he did not use the communication in arriving at his sentence.  (*Id.* at 25-26.)  Because the court relied so heavily on *Smith*, a case that treated the Maryland Rules as incorporating relevant due process protections, it is likely that the court also viewed the relevant Maryland Rules as incorporating Grimes's due process arguments, and that is why the court stated that it "need not reach" those arguments.  (*Id.* at 18.)

Grimes's claims would fail to satisfy the standard of review set out in § 2254(d).  As to Grimes's argument that the trial court violated his asserted right to be present at all stages of criminal proceedings, Grimes concedes that the Supreme Court has not examined the constitutionality of a post-verdict, pre-sentence discussion between a judge and juror.  (*See* Grimes Reply 11, ECF No. 6 (noting that "the only court to have expressly considered the constitutionality of such communications" is a New Jersey state court).)  Certainly no Supreme Court case has held that the type of error here (to the extent one existed) "was so lacking in justification" that it was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87.  The same is true for Grimes's argument that the trial court violated his asserted right to know in advance of the sentencing hearing the information that would be used in sentencing him and to contest the accuracy of that information: there is no clearly established law, as articulated by the holdings of the Supreme Court, making clear that the trial judge's actions here violated due process.

[5]     The court recognizes that Grimes frames his argument concerning his right to be present at all stages of the proceedings against him as arising from both the Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause.  The court refers to this claim, for the sake of simplicity, as a due process claim arising from the Fourteenth Amendment.

[6]     The court will assume without deciding that the sentencing judge committed error.

[7]     Despite Grimes's arguments to the contrary, this case does not present the sort of "structural defect" requiring automatic reversal.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (stating that "most constitutional errors" are subject to analysis for harmless error, but errors presenting "structural defects" are not).

Even if the trial court erred, this court has no grave doubt that the asserted error was harmless.  The trial court made clear that the sentence stemmed not from the jury's reasons for acquitting Grimes of attempted kidnapping, but from the nature of the assault.  As the court stated at the sentencing hearing, Grimes "stalked Mrs. Hilfiker[8] that day prior to the assaults, frightened her out of her wits prior to the assaults, punched her, tripped her, hit[ ] her, [and] dragg[ed] her."  (ECF No. 1-7 at 38.)  The court credited Hilfiker's testimony that Grimes said to her as she struggled to free herself that she was going to get in the car, and it would get worse.  (*Id.*)  It is true that Judge Beck referenced his conversation with the jury, saying that it "came that close to finding [Grimes] guilty of attempted kidnapping."  (*Id.* at 39.)  But he also made clear that the attempted kidnapping charge was "not before" him.  (*Id.*)  Under these circumstances, any error did not have a substantial and injurious effect on Grimes's sentence.

Because the court is confident that any error was harmless, the court will deny Grimes's petition for habeas corpus based on the trial court's asserted violations of his constitutional right to be present at all stage of criminal proceedings and of his due process right to know in advance of the sentencing hearing the information that would be used in sentencing him and to contest the accuracy of that information.

### C.  Grimes's Claim of Ineffective Assistance of Counsel

To maintain a claim of ineffective assistance of counsel, Grimes must show that "counsel's performance was deficient" and this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.  *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).  "*Strickland* does not guarantee perfect representation,

---

[8]        The sentencing transcript misspelled Ms. Hilfiker's name as Hilficker.

only a 'reasonably competent attorney.'" *Richter*, 131 S. Ct. at 791 (quoting *Strickland*, 466 U.S. at 687). Prejudice exists only where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 684.

Where § 2254(d)(1) applies and the issue is whether the state court has unreasonably applied *Strickland* to an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 131 S. Ct. at 785. Review is therefore "doubly deferential": a federal habeas court must defer to a state court's reasonable grant of deference to trial counsel's performance. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786.

The state court assessed Grimes's claim of ineffective assistance of counsel as follows:

> Relief on this allegation is denied. The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail, the Petitioner must prove 1) his trial counsel was deficient, and 2) the deficiency prejudiced his case. *Id.* at 687. The proper standard for attorney performance is that of reasonably effective assistance. *Id.* Here, Mr. Grimes complains that his attorney did not object strenuously enough to a communication that both the trial court and the Court of Special Appeals determined did not prejudice his case. Therefore, whether or not [defense counsel] objected to a degree satisfactory to Mr. Grimes is irrelevant. There was no error and, therefore, nothing to preserve. The petitioner offers no other evidence to support his allegation of ineffective assistance of counsel.

(ECF No. 1-3 at 5-6.) Grimes argues that his Sixth Amendment claim was based on trial counsel's failure to seek a continuance or the disqualification of Judge Beck, not on counsel's failure to object strenuously enough. He says the court therefore rejected an argument he did not make, and such a circumstance cannot constitute a merits determination.

This argument fails.  The state court's determination that "[t]here was no error and, therefore, nothing to preserve," is enough to show that Grimes's claim of ineffective assistance of counsel was adjudicated on the merits.  If a summary order devoid of analysis constitutes an adjudication on the merits, *Richter*, 131 S. Ct. at 784-85, surely this sentence must suffice.  In any event, however, Grimes's claim of ineffective assistance of counsel fails under both the deferential review set out in § 2254(d) and de novo review.

At the post-conviction hearing, Grimes's trial counsel, Jane Miller, testified that she was surprised when she learned at sentencing that jurors had told Judge Beck why they acquitted Grimes of attempted kidnapping.  (ECF No. 1-6 at 13.)  Upon reflection, Miller testified that she made a "mistake" by not seeking a continuance of the sentencing hearing.  (*Id*. at 15.)  Miller did not state what use, if any, she would have made of the continuance.

Judge Beck, testifying for the State at the post-conviction hearing, stated that he met with the jury as a courtesy for approximately ten minutes following the verdict.  (*Id*. at 20, 22-23.) Specifically, he wanted to ask the jurors about their experience, thank them for their service, and answer questions they might have.   (*Id*. at 22-23, 30.)  Judge Beck recalled that, without his prompting, "some or more members of the jury told [him] that they had some difficulty with the [attempted] kidnapping charge," in particular, the "asportation" element.  (*Id*. at 23, 30.)  As to why he sentenced Grimes to the statutory maximum ten years in prison for second-degree assault, Judge Beck testified as follows:

> Well, if you read the slip opinion pages 5 and 6, and then page 12 and 13 of my reasons for exceeding the guidelines, I think I set forth that this was a particularly vicious assault. It involved stalking.  It involved premeditation.  It involved several drive-bys of the victim.  It involved the Defendant physically assaulting the victim while he was dragging her around the back of the car and towards an open passenger door, wherein ropes were subsequently discovered.  And his words to the victim, which she testified regarding, and which I believed, that "It's only going to get worse.", and "I'll have to punch you to keep you from

> screaming." And he did attempt to punch her in the face, tripped her, dragged her towards the car. About that time, a witness neighbor came out and asked the Defendant, according to her, "Who the hell are you?  Who the hell do you think you are?  What the hell do you think you're doing?", whereupon he disengaged and left the scene.  So I . . . I thought that it was one of the more vicious assaults and attacks that have come before me in my years on the bench and that it justified the maximum sentence.  I didn't take attempted kidnaping . . . attempted kidnaping into consideration.  I stated that on the record.

(*Id.* at 28-29.)  Judge Beck reiterated: "There was nothing that I took into consideration regarding attempted kidnaping.  I based it on the nature and extent of the assault."  (*Id.* at 29.)

The post-conviction court's statement of reasons denying Grimes his requested relief cited *Strickland*, reiterated that Judge Beck had not erred, and concluded that because "[t]here was no error," trial counsel's failure to act did not constitute ineffective assistance of counsel. (ECF 1-3 at 6.)  This determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 131 S. Ct. at 786-87, and Grimes cites no authority to support his position that counsel was compelled by constitutional standards to seek a continuance or request Judge Beck's recusal.  Accordingly, Grimes's claim of ineffective assistance of counsel fails under the review required by § 2255(d).

Under de novo review, Grimes's claim fails on the prejudice prong.  The court has already explained why it is confident that the sentencing judge's conversation with the jury did not cause the judge to give Grimes a sentence longer than he would have had the conversation not taken place.  Those reasons apply with equal force here.  The judge made clear that it was the nature of the assault, not the jury's reasons for acquitting Grimes of attempted kidnapping, that led the judge to reach a sentencing determination.  The nature of the assault remains the same regardless of whether Grimes's counsel sought a continuance or recusal.  Grimes is not entitled to relief on his claim of ineffective assistance of counsel.

**III.    Certificate of Appealability**

A certificate of appealability shall not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable.  *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).  Reasonable jurists would not find Grimes's claims debatable, and the court will therefore not issue a certificate of appealability.

**CONCLUSION**

For the reasons stated above, Grimes's petition for writ of habeas corpus will be denied and dismissed, and a certificate of appealability shall not issue.  A separate order follows.

Dated:  November 26, 2014                            _____/S/_____

                                                     Catherine C. Blake
                                                     United States District Judge